UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Gregory Jackson, | |
|     Plaintiff, | Case No. 16-cv-5518 |
| v. | |
| BNSF Railway Co., | Judge John Robert Blakey |
|     Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Gregory Jackson sued his employer, Defendant BNSF Railway Co., for alleged retaliation and discrimination in violation of multiple statutes, including the Federal Railway Safety Act (FRSA), the Americans with Disabilities Act (ADA), Title VII of the Civil Rights Act, and the Family and Medical Leave Act (FMLA). [47]. BNSF moved for summary judgment on all claims. [83]. For the reasons explained below, this Court partially grants and partially denies BNSF's motion.

### I.    Background

The facts come from BNSF's Local Rule 56.1 statement of facts [84] and Plaintiff's Local Rule 56.1 statement of additional facts [93].

### A.  FRSA Claim

Plaintiff, an African-American man, has worked as a union conductor on BNSF's Metra Aurora-Chicago passenger line since 2003. [84] ¶¶ 11–12. Plaintiff works Monday through Friday from 6:07 a.m. to 7:30 p.m.; he conducts a morning train from Aurora to Chicago and an afternoon train from Chicago to Aurora. *Id.* ¶

1

14. During the time between morning and afternoon trains—"respite time"—Plaintiff does no work for BNSF, but still gets paid. *Id.* ¶ 15. The parties dispute whether BNSF could require Plaintiff to work during respite time. *See* [92] ¶ 15. Plaintiff also works every other Saturday evening. [84] ¶ 14.

In February 2015, Plaintiff and his coworker Roy Nicholas had an altercation at work. [93] ¶ 17. The parties dispute the exact details of what happened, but they agree that Nicholas punched Plaintiff in the face. [84] ¶ 30. Plaintiff reported the altercation to his manager. *Id.* ¶ 31. Because BNSF policy prohibits employees from engaging in any conduct that may harm another employee, a formal investigation followed. *Id.* ¶¶ 8, 33.

Pursuant to its policy on violence in the workplace, BNSF withheld both Plaintiff and Nicholas from service until the investigation concluded. *Id.* ¶¶ 32, 35–36. BNSF policy states that "any act of hostility" that affects "the interest of the company or its employees is cause for dismissal." *Id.* ¶ 9. BNSF policy also prohibits retaliating against an employee for "making a good-faith report of an Act of Violence or Threat of Violence." [93] ¶ 6. As part of the formal investigation, a hearing officer found that Plaintiff started the altercation with Nicholas "by using profane language and repeatedly demanding that Nicholas 'get the fuck off the radio.'"[1] [84] ¶ 34. The hearing officer recommended terminating both Plaintiff and Nicholas. *Id.*

---

[1] Plaintiff moved to strike the "hearsay evidence" that the hearing investigator relied upon. [92] at 11. Plaintiff's own statements, when offered against him, do not constitute hearsay. Fed. R. Evid. 801(d)(2). This Court thus declines to strike the admissible evidence that Plaintiff wrongly characterized as inadmissible hearsay.

2

BNSF fired Nicholas, but did not fire Plaintiff, instead suspending him for the 61 days he was held out of service and assessing him a Level S (serious) violation. *Id.* ¶ 35; [93] ¶ 7. Plaintiff's suspension concluded on Tuesday, April 28, 2015, but he did not return to work until the following Tuesday. [84] ¶ 36. Plaintiff alleges that his suspension and Level S violation amount to unlawful retaliation for reporting the altercation with Nicholas. Plaintiff knew that threats and violence in the workplace were dismissible offenses under BNSF policy, but believes that the policy should not apply to him because he "was not the aggressor." *Id.* ¶ 73.

BNSF conductors, including Plaintiff, must comply with BNSF's attendance policy, which clarifies the circumstances under which BNSF can discipline them for absenteeism. *Id.* ¶ 18. Under the conductors' collective bargaining agreement (CBA), Plaintiff receives four weeks of paid vacation and ten personal leave days each year. *Id.* ¶ 21. Also, conductors may miss work on an unpaid, unexcused basis three times in a three-month period. *Id.* Before BNSF can discipline an employee for violating the attendance policy, it must conduct an investigative hearing. *Id.* ¶ 23. Based on the evidence presented, the hearing officer may recommend progressive discipline pursuant to the guidelines. *Id.* ¶ 24.

From July 2015 to January 2017, Plaintiff's attendance record triggered three investigations. *Id.* ¶ 53. The first investigation concerned six absences in May and June 2015 that BNSF deemed unexcused. *Id.* ¶ 54. Plaintiff disputes at least two of these absences—the Friday and Saturday in early May following his return from suspension. [92] ¶ 54. The second investigation concerned four unexcused call-offs

3

between November 2015 and January 2016. [84] ¶ 55. Plaintiff faced a third formal investigation for having four unexcused absences during November and December 2016. *Id.* ¶ 56. Plaintiff argues that BNSF should have excused one of those absences as FMLA leave. *See* [92] ¶ 56. At each investigation, the hearing officer recommended discipline, which BNSF assessed in line with its attendance policy's mandated progression. [84] ¶¶ 60–61.

### B. FMLA & ADA Claims

From 2003 to the present, Plaintiff regularly sought FMLA leave for his bronchial asthma. *Id.* ¶ 27. BNSF approved Plaintiff for FMLA leave 15 times and denied only one leave request. *Id.* That denial, which occurred when Plaintiff submitted "what had become his annual FMLA intermittent-leave request" in May 2015, forms the crux of Plaintiff's FMLA claims. *Id.* ¶ 37.

Under federal law and BNSF's FMLA policy, employees must have worked at least 1,250 hours during the 12 months immediately preceding the start of their requested leave to qualify for FMLA leave. *Id.* ¶ 38. Margaret Trevino, BNSF's benefits specialist, processed Plaintiff's May 2015 leave request. *Id.* ¶ 40. BNSF's software, which did not count respite time toward working hours, determined that Plaintiff had worked only 1,112 hours in the preceding year. *Id.* Although Plaintiff had 279 scheduled work days in the preceding 12 months, he worked just 172 of those days. *Id.* ¶ 42. BNSF did, however, pay him wages for 13.5 hours each day (including respite time), totaling over 2,300 paid hours for the same 12 months. [93] ¶4. The parties dispute whether respite time counts toward hours of service, meaning the

4

work hours necessary for FMLA eligibility. *See* [92] ¶ 39. Based upon the calculation that Plaintiff worked only 1,112 hours in the relevant period, Trevino denied his FMLA request in June 2015. [84] ¶ 43.

A few days later, Plaintiff submitted an ADA request for accommodation for his asthma. [93] ¶ 10. Plaintiff asked BNSF to accommodate "the conditions that are outlined in the FMLA package," and included a doctor's note stating that Plaintiff "needs to be granted FMLA package due to the medical condition." *Id.* ¶ 46. Heather Miller, BNSF's EEO Director, reminded Plaintiff that he was ineligible for FMLA leave and suggested alternatives, such as using personal leave, taking a medical leave, or contacting an administrator to discuss leave options he might have under the CBA. *Id.* ¶ 47. Plaintiff did not pursue any of these options. *Id.* ¶ 48.

In July 2015, Plaintiff emailed Miller to clarify his request, stating that he sought a "modified work schedule" rather than an FMLA package. *Id.* ¶ 49. Miller responded three days later and asked Plaintiff to explain further: "Would you please let me know what specific modifications you are seeking to your work schedule? Are you asking to be excused from complying with the written Attendance Guidelines that govern your position so that you can take time off, on an intermittent basis, in excess of your allowed vacation, PLDs (personal leave days) and scheduled time off?" *Id.* ¶ 50. Plaintiff never responded to Miller's email, *id.* ¶ 51, although it appears that he contacted BNSF's benefits team about his request several months later, in February and May 2016, [93-3] at 22–23.

In December 2016, BNSF had again approved Plaintiff for FMLA leave and Plaintiff attempted to take a day of FMLA leave on December 11. [93] ¶ 16. Because Plaintiff could not enter the leave request in BNSF's attendance system, he asked a trainmaster to process the leave request for him. *Id.* ¶ 31. But the trainmaster accidentally entered the absence in an unexcused category instead of as FMLA leave, which pushed Plaintiff over the allowed threshold for unexcused absences. *Id.* ¶ 16. As a result, Plaintiff received a 20-day suspension for violating BNSF's attendance policy. *Id.* ¶ 31.

**D. Title VII Claim**

Plaintiff admits that no one told him he was ineligible for FMLA in 2015 because of his race and that he did not hear any racial comments related to his FMLA request. [84] ¶ 65. Plaintiff alleges that a Caucasian co-worker named Bob Kobliska received FMLA leave without working the requisite number of hours, but BNSF granted Kobliska's request for intermittent FMLA leave *before* he missed four months of work due to a suspension. *Id.* ¶¶ 66–67. Plaintiff admits that BNSF treated his hours worked the same as every other conductor's for the purposes of determining FMLA eligibility, *id.* ¶ 68, but Plaintiff contends that BNSF counted respite time as hours worked "in the past," [93-3] at 4.

Plaintiff also claims that Caucasian employee Jeff Stadler "was physically assaulted at work" and "did not strike back," like Plaintiff; unlike Plaintiff, Stadler returned to work immediately. [93] ¶ 68. Plaintiff admits, however, that he never witnessed Stadler have an altercation with another employee, never reviewed

6

Stadler's disciplinary record, and does not actually know whether BNSF ever knew of or disciplined Stadler for being involved in a fight. [84] ¶ 74. Per BNSF, Stadler was involved in an altercation in December 2006, and, like Plaintiff, received a Level S violation and a suspension of an unspecified length. *Id.* ¶ 75.

## II. Legal Standard

Courts should grant summary judgment when the moving party shows that no genuine dispute exists as to any material fact and the evidence weighs so heavily in the moving party's favor that the moving party "must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also* Fed. R. Civ. P. 56. A genuine dispute as to a material fact exists when, based upon the evidence, a reasonable jury could find for the non-moving party. *Anderson*, 477 U.S. at 248. To show a genuine dispute as to a material fact, the non-moving party must point to "particular materials in the record," and cannot rely upon the pleadings or speculation. *Olendzki v. Rossi*, 765 F.3d 742, 746 (7th Cir. 2014).

At summary judgment, courts must evaluate evidence in the light most favorable to the non-moving party and refrain from making credibility determinations or weighing evidence. *Rasho v. Elyea*, 856 F.3d 469, 477 (7th Cir. 2017) (citing *Anderson*, 477 U.S. at 255). The moving party bears the burden of establishing the lack of genuine disputes as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## III. Analysis

Plaintiff asserts the following claims: retaliation under the FRSA (Count II),

7

FMLA interference (Counts III and IV), discrimination and retaliation under the ADA (Counts V and VI), and discrimination and retaliation under Title VII (Counts VII and VIII).[2] [47]. This Court first addresses BNSF's arguments about waiver, [98] at 13–14, before turning to the merits of Plaintiff's claims.

## A. Waived Claims

In his response brief, Plaintiff fails to address BNSF's legal arguments regarding his ADA and Title VII retaliation claims (Counts VI and VIII) and his race discrimination claim (Count VII), and indeed, fails to defend those claims in any way. *See generally* [94]. Plaintiff thus waived these claims. *See, e.g., Keck Garrett & Assocs., Inc. v. Nextel Commc'ns, Inc.*, 517 F.3d 476, 487 (7th Cir. 2008). Although Plaintiff mentions his ADA discrimination claim (Count V) in his response brief, he provides only one paragraph—bereft of any citations to record evidence or legal authority—addressing that claim. [94] at 11. Thus, Plaintiff also waived Count V. *See Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 569 (7th Cir. 2004) ("We have made it clear that a litigant who fails to press a point by supporting it with pertinent authority," or by demonstrating its soundness "despite a lack of supporting authority, forfeits the point.") (internal quotation marks omitted). Accordingly, this Court grants summary judgment to BNSF on Counts V, VI, VII, and VIII. *See id.*

## B. FRSA Retaliation: Count II

The FRSA prohibits a railroad carrier from "discharging, demoting, suspending, reprimanding, or discriminating" against an employee for engaging in

---

[2] This Court previously granted BNSF's motion to strike Count I of Plaintiff's complaint [55].

certain protected activities. 49 U.S.C. § 20109. Plaintiff alleges that BNSF violated the FRSA by suspending him for making his injury and workplace violence report and by using the suspension to assess further discipline by denying his FMLA request. [47] ¶ 35. To prevail on his FRSA retaliation claim, Plaintiff must show that: (1) he engaged in protected activity; (2) his employer knew that he engaged in protected activity; (3) he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action. 49 U.S.C. § 20108(d)(2)(A); *Armstrong v. BNSF Ry. Co.*, 880 F.3d 377, 381 (7th Cir. 2018). If a plaintiff establishes these four elements, the employer may avoid liability if it can prove, "by clear and convincing evidence, that it would have taken the same action absent the protected activity." *Armstrong*, 880 F.3d at 381. Evidence that might create an inference that the protected activity contributed to the adverse action includes: "temporal proximity, indications of pretext, inconsistent application of the employer's policies, an employer's shifting explanations for its actions, antagonism or hostility toward a complainant's protected activity, the falsity of an employer's explanation for the adverse action taken, and a change in the employer's attitude toward the complainant after he or she engages in protected activity." *Cyrus v. Union Pac. R.R. Co.,* No. 12-C-10248, 2015 WL 5675073, at *11 (N.D. Ill. Sept. 24, 2015) (internal quotation marks omitted).

    BNSF contests only the fourth prong and argues that Plaintiff fails to show that his protected activity improperly contributed to BNSF suspending him. [85] at 23. For protected activity to be a contributing factor under the FRSA, the plaintiff

9

must show that discriminatory animus at least partially motivated the employer's action; merely showing a causal link between the protected activity and the employer's action does not suffice. *See Armstrong*, 880 F.3d at 382; *Koziara v. BNSF Ry. Co.*, 840 F.3d 873, 878 (7th Cir. 2016) ("The district judge's remark that the plaintiff's injury report to the company had initiated the events that led to his being fired" for a separate violation of company policy "and therefore had contributed to it is a further example of confusing a cause with a proximate cause."). Plaintiff fails to meet his burden to show discriminatory animus.

Plaintiff claims that BNSF retaliated against him for reporting the altercation with Nicholas, [84] ¶ 73, but the undisputed facts do not permit that causal inference. The record indicates that BNSF policy prohibits employees from engaging in any conduct that may harm another employee and that BNSF normally (as it did with Plaintiff and Nicholas) withholds both participants in a physical altercation from service until a formal investigation concludes. [84] ¶¶ 8, 32–36. The investigating officer found that Plaintiff started the altercation with Nicholas "by using profane language and repeatedly demanding that Nicholas 'get the fuck off the radio.'" *Id.* Because of Plaintiff's role in the fight, the officer recommended terminating Plaintiff. *Id.* Plaintiff claims that BNSF's policy on workplace violence does not apply to him because he "was not the aggressor," [84] ¶ 73, but nothing in the record indicates that the policy distinguishes between the aggressor and the responding party. In short, the record indicates that BNSF followed its normal policies and disciplined Plaintiff

for his role in starting the fight, not for submitting a report about it. *See Koziara*, 840 F.3d at 878–79.

The factors outlined in *Cyrus* also fail to establish the necessary causal connection between Plaintiff's protected activity and the discipline assessed. Before Plaintiff reported the fight, BNSF had previously granted his FMLA requests over a dozen times and—with the exception of the 2015 denial—continued granting his FMLA requests after he reported the fight. [92] ¶ 27. Thus, the evidence does not demonstrate "a change in the employer's attitude toward the complainant after he or she engages in protected activity." *See Cyrus,* 2015 WL 5675073, at *11. Plaintiff also fails to provide any evidence of pretext or hostility towards his protected activity; after Plaintiff reported the altercation with Nicholas, BNSF, pursuant to its policy, conducted a formal investigation that included a hearing where Plaintiff enjoyed the assistance of a union representative and had the chance to present evidence on his own behalf. [92] ¶¶ 23, 34, 78. As for "inconsistent application of the employer's policies," *Cyrus,* 2015 WL 5675073, at *11, Plaintiff merely speculates that BNSF treated another employee, Stadler, differently by allowing Stadler to return to work immediately after he was physically assaulted at work, *see* [93] ¶ 8. But Plaintiff's speculation cannot create a genuine issue of material fact at summary judgment, *see Devbrow v. Gallegos*, 735 F.3d 584, 588 (7th Cir. 2013), and BNSF's undisputed evidence shows that it issued Stadler a Level S violation and suspended him under similar circumstances, [84] ¶ 75.

Only temporal proximity weighs in Plaintiff's favor. BNSF withheld Plaintiff

from service almost immediately after he reported the altercation, although it did not formally suspend him until the investigation concluded about two months later. *Id.* ¶¶ 32–36. The Seventh Circuit has not yet decided whether temporal proximity alone can satisfy the fourth prong of an FRSA claim, but the Eighth Circuit has held that it cannot. *See Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 792 (8th Cir. 2014); *Hervey v. County of Koochiching*, 527 F.3d 711, 723 (8th Cir. 2008), *cert. denied*, 555 U.S. 1137 (2009). And again, the mere fact that Plaintiff's report initiated the chain of events leading to his ultimate suspension for violating BNSF's policy does not show any discriminatory animus here, because the report was not the proximate cause of his suspension. *See Koziara*, 840 F.3d at 877–78 ("The plaintiff's having been born was an initiating event without which he would not exist, but obviously an event devoid of legal significance."); *BNSF Ry. Co. v. U.S. Dep't of Labor Admin. Review Bd.*, 867 F.3d 942, 946 (8th Cir. 2017) (Holding that "protected activity is a 'contributing factor' to an adverse action simply because it ultimately led to the employer's discovery of misconduct" confuses a cause with a proximate cause.) (internal quotation marks omitted). On the record before this Court, no reasonable jury could find that BNSF disciplined Plaintiff because of his workplace violence report, rather than because of his involvement in the altercation with Nicholas. Thus, this Court grants summary judgment to BNSF on Count II.

### C. FMLA Interference Claims

Plaintiff's complaint alleges that BNSF interfered with Plaintiff's rights under the FMLA by: (1) ignoring methods provided by law to determine FMLA eligibility

under 29 C.F.R. § 825.200(b); (2) failing to apply a method that is consistent and uniform to all employees under 29 C.F.R. § 825.200(d)(1); (3) failing to provide a 60-day notice of any change in its method of determining FMLA eligibility under 29 C.F.R. § 825.200(d)(1); and (4) failing to apply its FMLA practice or policy uniformly under 29 U.S.C. § 2614(a)(4). [47] ¶ 40. Plaintiff narrowed his FMLA interference claims, however, by admitting that BNSF treated his hours worked the same as every other conductor's for the purposes of determining FMLA eligibility. *See* [84] ¶ 68.

To succeed on a claim for FMLA interference, Plaintiff must show that: (1) he qualified for the FMLA's protections; (2) his employer was covered by the FMLA; (3) he was entitled to take leave under the FMLA; (4) he provided sufficient notice of his intent to take leave; and (5) his employer denied him FMLA benefits to which he was entitled. *Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 993 (7th Cir. 2010). The parties dispute only the first prong: whether Plaintiff qualified for FMLA protection.

The FMLA confers the right of family leave "*only* on employees who have worked at least 1,250 hours in the previous 12 months." *Pirant v. U.S. Postal Serv.*, 542 F.3d 202, 206 (7th Cir. 2008) (citing 29 U.S.C. § 2611(2)(A)). The FMLA also provides that the Fair Labor Standards Act (FLSA) sets the legal framework for determining whether an employee met the FMLA's hours-worked requirement. 29 U.S.C. § 2611(2)(C). Under the FLSA, break time counts toward an employee's hours worked if the employee spends his or her break time "predominantly for the benefit of the employer." *See Alexander v. City of Chicago*, 994 F.2d 333, 337 (7th Cir. 1993) (internal quotation marks omitted). To determine whether break time meets that

standard, a court must consider "contractual agreements between the parties, the nature and extent of restrictions on the employee's time, and surrounding circumstances." *Bhd. of Locomotive Eng'rs & Trainmen v. Union Pac. R.R. Co.*, No. 08-C-3591, 2009 WL 2985694 at *3 (N.D. Ill. Sept. 15, 2009) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 137 (1944)). Whether break time counts toward an employee's hours worked presents a question of law for the court to resolve based upon the specific facts and circumstances of the case. *See Llorca v. Sheriff, Collier Cnty., Fla.*, 893 F.3d 1319, 1324 (11th Cir. 2018); *Chao v. Tradesmen Int'l, Inc.*, 310 F.3d 904, 907 (6th Cir. 2002).

### 1. Improperly Calculating Hours Worked: Count III

When BNSF denied Plaintiff's May 2015 FMLA request, its recordkeeping software did not count respite time toward working hours. [92] ¶ 39. So, although Plaintiff had been paid for over 2,300 hours for the previous 12 months, he recorded only 1,112 working hours—138 hours short of the required 1,250. *Id.* ¶ 40. BNSF maintains that the conductors' CBA prohibits BNSF from requiring conductors to perform work during respite time, and BNSF provided evidence that conductors largely have the freedom to do whatever they want during respite time. *See* [84] ¶¶ 15–17. Plaintiff's manager testified that he does not know of Plaintiff ever working for BNSF during respite time. *Id.* ¶ 17. By contrast, Plaintiff says that BNSF forced him to perform work during respite time at some point "from 2003 to the present," [93-3] at 2, but he does not specify when he had to work, how many hours he worked, or if working during respite time was a regular occurrence or a one-time event.

14

Without more details, Plaintiff's statement that he worked during respite time at least once over a 15-year period does not create a genuine issue of material fact as to whether he worked at least 138 hours more than BNSF calculated in the 12 months preceding his May 2015 FMLA request. *See McMahan v. Deutsche Bank AG*, 892 F.3d 926, 933 (7th Cir. 2018) (a mere "scintilla of evidence" supporting the non-moving party's position does not suffice to avoid summary judgment).

On its face, BNSF's practice of excluding respite time from hours worked does not violate the FMLA. In a similar case, the court held that a railroad properly excluded time that railroad engineers spent in "OK status" between shifts when calculating FMLA eligibility. *Bhd. of Locomotive Eng'rs*, 2009 WL 2985694, at *3–*4. Though the railroad imposed certain restrictions on the engineers—such as refraining from drinking alcohol, getting enough rest to operate a train, and being able to report to work within a specified amount of time—the restrictions were not so severe that they changed the time into work. *Id.* at *2, *5 (noting that engineers in OK status may "engage in a wide variety of leisure activities and can use their time as they choose, with limited exceptions").

Likewise, the Seventh Circuit held in another case that time that emergency medical technicians (EMTs) spent "on call" did not qualify as work; even though EMTs had to be able to arrive at the hospital within seven minutes of receiving a page, they could otherwise use on-call time for numerous personal pursuits. *Dinges v. Sacred Heart St. Mary's Hosps.*, 164 F.3d 1056, 1058 (7th Cir. 1999).

Moreover, the Seventh Circuit noted that courts should avoid overriding voluntary contractual arrangements between parties (like the conductors' CBA here) because such judicial oversight "has the potential to make everyone worse off." *Id.* at 1059. The conductors and BNSF agreed to a CBA that benefits both sides. Contrary to Plaintiff's view, it is far from "unbelievable" that BNSF pays Plaintiff and his co-workers "during a time that they can do whatever they want." [94] at 8. Paying conductors for respite time allows BNSF to attract employees to a job with an unusual work schedule that many people would not want, and to avoid hiring and managing different conductors for each shift. The conductors, of course, enjoy the financial benefits of earning money while not technically on the job. *See Dinges*, 164 F.3d at 1059 ("The prospect of being paid for spending time at home (even time asleep) must have been attractive" to the EMTs who contracted for on-call work.).

Although Plaintiff purported to bring a claim that BNSF improperly changed its methodology for calculating FMLA eligibility without giving the required 60-day notice of the change, he fails to make any argument in his response brief supporting that aspect of his FMLA interference claim. *See generally* [94]. Plaintiff thus waived that argument. *See Keck Garrett*, 517 F.3d at 487. Accordingly, this Court grants summary judgment to BNSF on Count III.

### 2. Incorrect Absence Classification: Count IV

Plaintiff also contends that BNSF improperly penalized him for taking FMLA leave in December 2016 because the trainmaster accidentally classified Plaintiff's FMLA leave as an unexcused absence, leading to Plaintiff receiving a 20-day

16

suspension. [93] ¶ 16. Even if the trainmaster made an honest mistake, BNSF may be liable under a theory of FMLA interference. Unlike retaliation claims, which require proof of discriminatory intent, "an interference theory requires only proof that the employer denied the employee his or her entitlements" under the FMLA. *Goelzer*, 604 F.3d at 995; *see also Johnson v. Morehouse Coll., Inc.*, 199 F. Supp. 2d 1345 (N.D. Ga. 2002) (an employer who fires an employee for exceeding her allowed FMLA leave may face liability on an interference claim if the employer incorrectly calculated the amount of leave the employee could take). Because Plaintiff's evidence indicates that he qualified for FMLA leave in late 2016 and BNSF denied him the excused absence to which he was entitled, this Court denies BNSF's motion as to Count IV.

## IV. Conclusion

For the reasons explained above, this Court partially grants and partially denies BNSF's motion for summary judgment [83]. This Court grants the motion as to Counts II, III, V, VI, VII, and VIII, and denies it as to Count IV. The 8/28/18 hearing is stricken. All other dates and deadlines stand, including the 11/5/18 trial date.

Dated: August 22, 2018

Entered:

_____
John Robert Blakey
United States District Judge